1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

JOHN M. TURNER,                          ) Case No. CV 12-9111-JPR
                                         )
                Plaintiff,               )
                                         )
        vs.                              ) MEMORANDUM OPINION AND ORDER
                                         ) AFFIRMING THE COMMISSIONER
                                         )
CAROLYN W. COLVIN,                       )
Acting Commissioner of                   )
Social Security,[1]                      )
                                         )
                Defendant.               )
                                         )

## I.   PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This matter is before the Court on the parties' Joint Stipulation, filed June 27, 2013, which the Court has taken under submission without oral argument.  For the reasons discussed

_____

    [1]    On February 14, 2013, Colvin became the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court therefore substitutes Colvin for Michael J. Astrue as the proper Respondent.

1

below, the Commissioner's decision is affirmed and this action is dismissed.

**II.  BACKGROUND**

Plaintiff was born on May 25, 1949.  (AR 50, 134.)  He completed high school and one year of college.  (AR 169, 250.) Plaintiff previously worked as a plant operator or lab technician in various refineries.  (AR 53-55, 165.)

On October 30, 2009, Plaintiff filed an application for DIB. (AR 82, 134-37.)  He alleged that he had been unable to work since October 23, 2008, because of hepatitis C, osteoarthritis, hypertension, swollen legs, and tinnitus.  (AR 134, 164.)  After Plaintiff's application was denied, he requested a hearing before an Administrative Law Judge ("ALJ").  (AR 93.)

A hearing was held on April 14, 2011, at which Plaintiff, who was represented by a nonattorney representative, testified, as did a vocational expert ("VE").  (AR 45-81.)  In a written decision issued May 9, 2011, the ALJ determined that Plaintiff was not disabled.  (AR 11-24.)  On August 30, 2012, the Appeals Council incorporated additional evidence into the record but denied Plaintiff's request for review.  (AR 1-7; see also 373-435.)  This action followed.

**III.  STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746

2

(9th Cir. 2007).   Substantial evidence means such evidence as a
reasonable person might accept as adequate to support a
conclusion.  <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter v. Astrue</u>,
504 F.3d 1028, 1035 (9th Cir. 2007).   It is more than a scintilla
but less than a preponderance.  <u>Lingenfelter</u>, 504 F.3d at 1035
(citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir.
2006)).   To determine whether substantial evidence supports a
finding, the reviewing court "must review the administrative
record as a whole, weighing both the evidence that supports and
the evidence that detracts from the Commissioner's conclusion."
<u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1996).   Moreover,
"when the Appeals Council considers new evidence in deciding
whether to review a decision of the ALJ, that evidence becomes
part of the administrative record, which the district court must
consider when reviewing the Commissioner's final decision for
substantial evidence."  <u>Brewes v. Comm'r of Soc. Sec. Admin.</u>, 682
F.3d 1157, 1163 (9th Cir. 2012); <u>see also</u> <u>Taylor v. Comm'r of</u>
<u>Soc. Sec. Admin.</u>, 659 F.3d 1228, 1232 (9th Cir. 2011).   "If the
evidence can reasonably support either affirming or reversing,"
the reviewing court "may not substitute its judgment" for that of
the Commissioner.  <u>Reddick</u>, 157 F.3d at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

     People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or which has lasted, or is expected
to last, for a continuous period of at least 12 months.   42
U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257

1    (9th Cir. 1992).

2        A.    The Five-Step Evaluation Process

3        The ALJ follows a five-step sequential evaluation process in

4    assessing whether a claimant is disabled.    20 C.F.R.

5    § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th

6    Cir. 1995) (as amended Apr. 9, 1996).    In the first step, the

7    Commissioner must determine whether the claimant is currently

8    engaged in substantial gainful activity; if so, the claimant is

9    not disabled and the claim must be denied.    § 404.1520(a)(4)(i).

10   If the claimant is not engaged in substantial gainful activity,

11   the second step requires the Commissioner to determine whether

12   the claimant has a "severe" impairment or combination of

13   impairments significantly limiting his ability to do basic work

14   activities; if not, a finding of not disabled is made and the

15   claim must be denied.    § 404.1520(a)(4)(ii).    If the claimant has

16   a "severe" impairment or combination of impairments, the third

17   step requires the Commissioner to determine whether the

18   impairment or combination of impairments meets or equals an

19   impairment in the Listing of Impairments ("Listing") set forth at

20   20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is

21   conclusively presumed and benefits are awarded.

22   § 404.1520(a)(4)(iii).    If the claimant's impairment or

23   combination of impairments does not meet or equal an impairment

24   in the Listing, the fourth step requires the Commissioner to

25   determine whether the claimant has sufficient residual functional

26

27

28

4

1  capacity ("RFC")[2] to perform his past work; if so, the claimant
2  is not disabled and the claim must be denied.
3  § 404.1520(a)(4)(iv).  The claimant has the burden of proving
4  that he is unable to perform past relevant work.  <u>Drouin</u>, 966
5  F.2d at 1257.  If the claimant meets that burden, a prima facie
6  case of disability is established.  <u>Id.</u>  If that happens or if
7  the claimant has no past relevant work, the Commissioner then
8  bears the burden of establishing that the claimant is not
9  disabled because he can perform other substantial gainful work
10 available in the national economy.  § 404.1520(a)(4)(v).  That
11 determination comprises the fifth and final step in the
12 sequential analysis.  § 404.1520; <u>Lester</u>, 81 F.3d at 828 n.5;
13 <u>Drouin</u>, 966 F.2d at 1257.

14      B.   <u>The ALJ's Application of the Five-Step Process</u>

15      At step one, the ALJ found that Plaintiff had not engaged in
16 any substantial gainful activity since October 23, 2008.  (AR
17 13.)  At step two, the ALJ concluded that Plaintiff had the
18 severe impairments of "right knee degenerative disc disease,
19 status post right knee arthroscopic partial medial and lateral
20 meniscectomies," and major depressive disorder.  (<u>Id.</u>)  At step
21 three, the ALJ determined that Plaintiff's impairments did not
22 meet or equal any of the impairments in the Listing.  (AR 14.)
23 At step four, the ALJ found that Plaintiff had the RFC to perform
24
25
26
_____

27      [2]   RFC is what a claimant can do despite existing
28 exertional and nonexertional limitations.  20 C.F.R. § 404.1545;
   <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

5

a limited range of medium work[3] as follows:

> [H]e can exert 20 to 50 pounds of force occasionally and/or 10 to 20 pounds of force frequently and/or greater than negligible up to 10 pounds of force constantly to move objects.  The claimant can stand and walk up to 6 hours and sit up to 6 hours in an 8-hour workday with normal breaks, provided that standing and walking does not exceed one hour at a time with at least an intervening 5-minute break to sit before resuming standing and walking.  He can perform work that does not require climbing ladders, ropes or scaffolds, or balancing, and does not require any exposure to hazardous machinery, unprotected heights, or other high risk, hazardous or unsafe conditions (i.e., dizziness/syncope precautions).  The claimant can occasionally kneel, crouch and crawl, and his work would involve the performance of simple, routine, repetitive tasks in a job that does not require more than occasional interaction with the public or coworkers.

(AR 15.)  Based on the VE's testimony, the ALJ concluded that Plaintiff was unable to perform any past relevant work.  (AR 22-23.)  At step five, the ALJ concluded that Plaintiff was not disabled under the framework of the Medical-Vocational

---

[3]     "Medium work" involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  § 404.1567(c).  The regulations further specify that "[i]f someone can do medium work, we determine that he or she can also do sedentary and light work," as defined in § 404.1567(a)-(b).

Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2; based on the testimony of the VE, he concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform. (AR 23-24.) Accordingly, the ALJ determined that Plaintiff was not disabled. (AR 24.)

**V. RELEVANT FACTS**

On September 11, 2007, an MRI of Plaintiff's right knee showed posterior horn medial and lateral meniscal tears, medial and lateral compartment osteoarthritis, a "poorly visualized anterior cruciate ligament" that was "suspicious for being torn," a Baker's cyst,[4] large joint effusion, proximal tibial erosion, and intrameniscal degeneration in the anterior horns of the medial and lateral menisci. (AR 222.) On September 21, 2007, Dr. Daniel E. Kaplan at the Orthopedic Surgery and Sports Medicine Group in Santa Fe Springs noted that Plaintiff complained of right-knee pain, summarized his MRI results, and suggested knee surgery. (AR 218.) Dr. Kaplan listed Plaintiff's work status as "TTD," or temporarily totally disabled. (Id.; see also AR 350.)

On November 5, 2007, Dr. Kaplan noted that Plaintiff had "[i]nternal derangement of the right knee" and performed an arthroscopy, partial medial meniscectomy, and partial lateral meniscectomy. (AR 225-28.) On November 13, 2007, Dr. Kaplan

---

[4]   A Baker's cyst is a fluid-filled cyst that causes a bulge and a feeling of tightness behind the knee. Baker's cyst, Mayo Clinic, http://www.mayoclinic.com/health/bakers-cyst/DS00448 (last updated Aug. 1, 2012). It is usually the result of a problem with the knee joint, such as arthritis or a cartilage tear, and treating the underlying problem usually provides relief. Id.

referred Plaintiff to physical therapy.  (AR 340.)  On December 11, 2007, Dr. Kaplan noted that Plaintiff had less pain in his right knee and was "doing well post op."  (AR 221.)  Dr. Kaplan noted that Plaintiff could return to regular work on December 17, 2007, without restriction.  (AR 221, 338.)

On January 11, 2008, Dr. Ronald E. Pinkerton, who specialized in family medicine (AR 336), noted that Plaintiff had right-knee arthritis and had undergone knee surgery (AR 327).  He noted that he needed to "call for approval for Hyalgan injection" and prescribed medication.[5]  (Id.)  On January 24, 2008, Dr. Pinkerton noted that Plaintiff had "severe" right-knee arthritis and administered an injection of Hyalgan and Xylocaine.[6]  (AR 326.)

On February 7, 2008, Dr. Pinkerton diagnosed arthritis and administered a Hyalgan injection to Plaintiff's right knee.  (AR 324.)  On February 21, 2008, Dr. Pinkerton administered another Hyalgan and Xylocaine injection to Plaintiff's right knee.  (AR 323.)  On March 13, 2008, Dr. Pinkerton wrote "hyalgan L knee" under the section of his note for "chief complaints / reason for visit / history of present illness."  (AR 322.)

On March 28, 2008, Dr. Pinkerton noted that Plaintiff had

---

[5]    Hyalgan is a medication used to treat knee pain in patients with osteoarthritis.  Hyalgan IAtc, WebMD, http://www.webmd.com/drugs/drug-4060-hyalgan+iatc.aspx?drugid=4060&drugname=hyalgan+iatc (last accessed Oct. 2, 2013).  It is similar to a substance that occurs naturally in the joints and works by acting as a lubricant and shock absorber.  Id.

[6]    Xylocaine, or lidocaine, is a local anesthetic.  Xylocaine, RxList, http://www.rxlist.com/xylocaine-drug.htm (last updated Dec. 15, 2010).

arthritis and administered a Hyalgan injection to his left knee. (AR 321.)  On April 21, 2008, Dr. Pinkerton administered a Hyalgan and Xylocaine injection to Plaintiff's right knee.  (AR 319.)  On May 8, 2008, Dr. Pinkerton noted that Plaintiff had right- and left-knee arthritis.  (AR 318.)

On June 23, 2008, Dr. Pinkerton noted that Plaintiff complained of feeling dizzy, nauseous, and fatigued for the past week.  (AR 317.)  Dr. Pinkerton diagnosed fatigue and depression and prescribed Prozac.  (Id.)  On July 3, 2008, he noted that Plaintiff had right-knee arthritis and administered an injection of Decadron and Xylocaine.[7]  (AR 316.)  On July 23, 2008, Dr. Pinkerton noted that Plaintiff had elevated lipids.  (AR 315.)

On September 10, 2008, Dr. Pinkerton noted that Plaintiff was dizzy, lightheaded, and short of breath and had "severe" bradycardia and elevated blood pressure.[8]  (AR 314.)  Dr. Pinkerton sent Plaintiff to the hospital "via 911."  (Id.)  That same day, an emergency-room physician, Edward Jarema, attributed Plaintiff's symptoms to his new blood-pressure medication, Inderal.[9]  (AR 231-32.)

---

[7]     Decadron, or dexamethasone, is a corticosteroid used to relieve inflammation and other medical conditions.  Dexamethasone Oral, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo /meds/a682792.html (last updated Sept. 1, 2010).

[8]     Bradycardia is a slower than normal heart rate. Bradycardia, Mayo Clinic, http://www.mayoclinic.com/health/ bradycardia/DS00947 (last updated May 26, 2011).

[9]     Inderal, or propranolol, is a beta blocker used to treat high blood pressure, abnormal heart rhythms, and other heart conditions.  Propranolol Oral, MedLinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682607.html (last updated Oct. 1, 2010).

1   On September 12, 2008, Dr. Pinkerton diagnosed Plaintiff
2   with bradycardia and dizziness and prescribed Valium.[10]   (AR
3   313.)   On September 17, 2008, Dr. Pinkerton diagnosed Plaintiff
4   with bradycardia, recommended that he "hold Inderal," and
5   prescribed Valium.   (AR 241.)

6   On October 20, 2008, just three days before the alleged
7   disability onset date, Dr. Pinkerton noted that Plaintiff had
8   fallen on his right leg while hunting rabbits.   (AR 240.)   Dr.
9   Pinkerton diagnosed cellulitis of the right lower extremity,
10  prescribed medication, and advised him to use a heating pad and
11  elevate his leg.   (Id.)

12  On October 30, 2008, Dr. Pinkerton diagnosed cellulitis and
13  knee arthritis, prescribed an antibiotic, and wrote "no work" on
14  his treatment note.   (AR 239.)   On January 9, 2009, he noted
15  Plaintiff's "follow-up visit" but did not list any diagnosis or
16  treatment plan.   (AR 238.)

17  On April 7, 2009, Dr. Pinkerton noted that Plaintiff
18  complained of right-foot pain for the past week and wanted
19  disability papers filled out.   (AR 237.)   Dr. Pinkerton diagnosed
20  increased lipids.   (Id.)   On July 2, 2009, Dr. Pinkerton
21  diagnosed right-knee arthritis.   (AR 236.)   On July 30, 2009, he
22  administered an injection of Xylocaine and Decadron to
23  Plaintiff's right knee.   (AR 235.)

24  On October 20, 2009, Dr. Pinkerton saw Plaintiff for a
25
26
27  [10]   Valium is used to relieve anxiety, muscle spasms, and
    seizures.   Diazepam, MedlinePlus, http://www.nlm.nih.gov/
28  medlineplus/druginfo/meds/a682047.html (last updated Oct. 1,
    2010).

"follow-up visit," noting his blood pressure, pulse, weight, and height but making no other findings.  (AR 234.)  On December 23, 2009, Dr. Pinkerton noted that Plaintiff had been feeling nervous for one month.  (AR 303.)  Dr. Pinkerton diagnosed chronic active hepatitis, fatigue, severe right-knee arthritis, and increased blood pressure.  (Id.)  He prescribed Vicodin and "SSDI," presumably referring to Social Security Disability Insurance. (Id.)

On January 6, 2010, Dr. Suzanne Dupee, a board-certified psychiatrist, examined Plaintiff at the Social Security Administration's request.  (AR 248-54.)  She noted that Plaintiff had been laid off from his job because of physical ailments and complained about depression and anxiety "mostly related to his future since he has limited funds."  (AR 249.)  Dr. Dupee noted that Plaintiff had not sought psychiatric treatment but that his "local doctor" had prescribed Prozac, clonidine, and Valium.[11] (Id.)  She noted that Plaintiff lived alone and was able to drive, clean, and perform basic household duties but had difficulty showering.  (AR 250.)

Dr. Dupee noted that Plaintiff looked older than his stated age and was well groomed, pleasant, polite, and cooperative. (Id.)  Plaintiff had a "depressed and anxious" mood and a flat and restricted affect but regular speech; linear, logical, and goal-directed thought process; and reasonable insight and judgment.  (AR 251.)  His thought content was "[s]ignificant for

---

[11]   Clonidine is used to treat high blood pressure. Clonidine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a682243.html (last updated Oct. 1, 2010).

depressive themes," and he had some suicidal thoughts but no
intent. (Id.) Plaintiff was two days off when giving the date,
but he was able to remember three out of three objects
immediately and after five minutes, make correct change,
calculate serial threes, spell the word "world" backward,
describe similarities and abstractions, and name various
political figures and the capital of California. (AR 251-52.)
Dr. Dupee diagnosed major depressive disorder and assigned a
global assessment of functioning ("GAF") score of 50.[12] (AR
252.) Dr. Dupee opined that Plaintiff was not impaired in his
ability to understand, remember, and carry out simple one- or
two-step job instructions but was moderately impaired in his
ability to complete detailed and complex instructions; relate and
interact with supervisors, coworkers, and the public; maintain
concentration, attention, persistence, and pace; associate with
day-to-day work activity, including attendance and safety; adapt
to common work stresses; maintain regular attendance; and perform
work activities on a consistent basis. (AR 253.) She believed
that Plaintiff's prognosis was "good." (Id.)

On January 11, 2010, Dr. Adi Klein, a board-certified
internist, reviewed some of Plaintiff's treatment notes and
performed a comprehensive internal-medicine evaluation at the

---

[12] A GAF score represents a rating of overall
psychological functioning on a scale of 0 to 100. See Am.
Psychiatric Ass'n, Diagnostic and Statistical Manual of
Disorders, Text Revision 34 (4th ed. 2000). A GAF score in the
range of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) OR
any serious impairment in social, occupational, or school
functioning (e.g., no friends, unable to keep a job)." Id.

1    Social Security Administration's request. (AR 257-62.) Dr.

2    Klein noted that Plaintiff complained of right-knee pain and

3    hepatitis C. (AR 257.) Plaintiff informed Dr. Klein that an MRI

4    had shown a tear and he thereafter underwent arthroscopic right-

5    knee injury, but he continued to have pain and swelling. (AR

6    258.) Plaintiff reported that he was able to dress, bathe, and

7    toilet without assistance and did not use a cane. (Id.) A

8    right-knee x-ray taken that day showed "[e]arly osteoarthritis

9    with more prominent changes in the medial compartment." (AR

10   263.)

11       Dr. Klein noted that Plaintiff's back had no tenderness or

12   spasm, equal muscle tone throughout, and normal range of motion.

13   (AR 260.) A straight-leg-raising test was negative. (Id.)

14   Plaintiff's knees had normal range of motion, with only "mild

15   pain" on the right and no effusion, deformity, crepitus, or

16   instability. (AR 261.) Plaintiff had normal range of motion of

17   the shoulders, elbows, wrists, hands, hips, and ankles; good

18   muscle tone and active motion; no atrophy or fasciculation; 5/5

19   strength throughout; intact sensation; and normal reflexes. (AR

20   260-61.) Plaintiff had a normal gait and heel-to-toe walk, a

21   normal ability to squat and rise, and no need for an assistive

22   device. (AR 262.) Dr. Klein diagnosed "[r]ight knee pain -

23   [e]arly arthritis by x-ray and history" and "[h]istory of

24   hepatitis-C - no sign on exam." (Id.) Dr. Klein opined that

25   Plaintiff could lift and carry 50 pounds occasionally and 25

26   pounds frequently, walk and stand for six hours in an eight-hour

27   workday, and sit for six hours in an eight-hour workday. (Id.)

28   Plaintiff had no postural, manipulative, visual, communicative,

                              13

or environmental limitations.  (Id.)  Attached to Dr. Klein's

report was a copy of Plaintiff's September 2007 MRI, with a

handwritten note stating "Plaintiff brought in 1/14."  (AR 264.)

On January 19, 2010, nonexamining physician Dr. R. Tashjian

reviewed Plaintiff's medical records and completed a psychiatric-

review-technique form and mental-RFC assessment.[13]  (AR 268-81.)

On the psychiatric-review-technique form, Dr. Tashjian noted that

Plaintiff had "MDD," or major depressive disorder, which resulted

in mild restriction of activities of daily living; moderate

difficulties in maintaining social functioning; and moderate

difficulties in maintaining concentration, persistence, or pace.

(AR 274, 279.)  Dr. Tashjian found "[i]nsufficient [e]vidence" of

repeated episodes of decompensation of extended duration.  (Id.)

On the mental-RFC assessment, Dr. Tashjian found that Plaintiff

was moderately limited in his ability to understand, remember,

and carry out detailed instructions; maintain attention and

concentration for extended periods; interact appropriately with

the general public; and respond appropriately to changes in the

work setting.  (AR 268-69.)  Dr. Tashjian found that Plaintiff

was not significantly limited in his ability to remember

locations and worklike procedures; understand, remember, and

carry out very short and simple instructions; perform activities

within a schedule; maintain regular attendance and be punctual

within customary tolerances; sustain an ordinary routine without

special supervision; work in coordination with or proximity to

---

[13]   Although Dr. Tashjian's opinion does not indicate his
gender, the ALJ refers to him as male.  (AR 22.)  The Court
therefore does as well.

others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals and make plans independently of others. (Id.) Dr. Tashjian also noted that Plaintiff could "complete simple repetitive tasks." (AR 270.)

On January 25, 2010, nonexamining physician B. Harris reviewed Plaintiff's medical records and completed a physical-RFC-assessment form. (AR 282-86.) Dr. Harris noted that Plaintiff's primary diagnosis was right-knee pain and opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, stand and walk for about six hours in an eight-hour day, sit for about six hours in an eight-hour day, and perform unlimited pushing and pulling. (AR 282-83.) She believed that Plaintiff had no postural or manipulative limitations.[14] (AR 284.)

On March 8, 2010, Dr. Pinkerton noted that Plaintiff

---

[14] Although Dr. Harris's opinion does not indicate her gender, the ALJ refers to her as female. (See AR 21.) The Court therefore does as well.

complained of lightheadedness and an upset stomach.  (AR 302.)
Dr. Pinkerton diagnosed anxiety and prescribed Valium.  (Id.)  On
April 6, 2010, Dr. Pinkerton met with Plaintiff and noted that he
needed "paperwork filled out."  (AR 301.)  That same day, Dr.
Pinkerton wrote a letter stating that Plaintiff "ha[d] been
disabled for the past five years."  (AR 299.)  Dr. Pinkerton
wrote that Plaintiff had "progressive arthritis particularly of
his knees and hands and he has seen several orthopedic
consultants with no lasting help with this."  (Id.)  Plaintiff
was "not yet a candidate for total knee replacement, but his
ability to perform his usual duties in his job are severely
limited."  (Id.)  Dr. Pinkerton noted that Plaintiff had
"progressive deformity and pain in his hands, back, and knees of
advanced osteoarthritis, not responsive to the usual medications
of non-steroidal antiinflammatories and opiods," and his
condition was "chronic, progressive, and will only get worse with
time."  (Id.)  Dr. Pinkerton also noted that a biopsy showed
"chronic active hepatitis" which resulted in "chronic fatigue."
(Id.)  Dr. Pinkerton concluded that Plaintiff was "severely
disabled with his arthritis and fatigue due to hepatitis C."
(Id.)

On August 13, 2010, Dr. Pinkerton listed "R knee
replacement" under "diagnosis" in his treatment notes.  (AR 370.)
That same day, Dr. Pinkerton completed a "Lower Extremities
Impairment Questionnaire," noting that Plaintiff was treated
first on September 16, 2006, and most recently on August 13,
2010.  (AR 329.)  He listed Plaintiff's diagnoses as right-knee
and right-foot arthritis and "arthritis generalized" and noted

that his prognosis was "poor." (Id.)  Dr. Pinkerton found that
Plaintiff had reduced range of motion of the right knee and
ankle, right femoral atrophy, right-knee swelling, and a positive
straight-leg-raising test on the left. (AR 330.)  Dr. Pinkerton
noted that Plaintiff had right-knee pain on walking and weight
bearing and could independently initiate ambulation but could not
sustain it. (AR 331.)  He noted that Plaintiff needed to use a
cane and a walker. (Id.)  He believed that Plaintiff could not
carry out activities of daily living without assistance but could
travel to and from his house and appointments, prepare meals, and
bathe and dress himself. (AR 332.)  Dr. Pinkerton opined that
Plaintiff could sit for five hours in an eight-hour day, stand
and walk for one hour in an eight-hour day, and could never lift
or carry any weight at all. (AR 332-33.)  He wrote that
Plaintiff needed to elevate his right leg to decrease pain, his
pain constantly interfered with his attention and concentration,
and he was incapable of even "low stress" jobs because of pain.
(AR 333-34.)  Dr. Pinkerton now believed Plaintiff needed a total
knee replacement. (AR 335.)

On December 14, 2010, Dr. Pinkerton noted that Plaintiff
complained of a right-foot abscess and anxiety and diagnosed
major depression, anxiety, and cellulitis of the right foot. (AR
371.)  Dr. Pinkerton prescribed Xanax and an antibiotic. (Id.)
On December 16, 2010, Dr. Pinkerton saw Plaintiff for followup of
his foot abscess and noted that he had inflamation and infection.
(AR 372.)

On February 14, 2011, Dr. Pinkerton noted that Plaintiff was
requesting a new antidepressant and a knee injection. (AR 407.)

Dr. Pinkerton noted that Plaintiff had "severe disabling arthritis" and prescribed medication.  (Id.)

     On June 6, 2011, after the ALJ issued his unfavorable decision, Dr. Pinkerton wrote a letter stating that Plaintiff had been under his care since September 16, 2006, and had generalized arthritis, severe right-knee arthritis, right-foot arthritis, and "significant and substantial hepatitis C."  (AR 430.)  Dr. Pinkerton noted that Plaintiff's prognosis for a full recovery was poor and his condition was chronic and progressive.  (Id.) He noted that several clinical findings supported his diagnoses, including chronic fatigue, reduced range of motion of the right knee and ankle, femoral atrophy in the right thigh, right-knee swelling, and a positive straight-leg raise on the left.  (Id.) Dr. Pinkerton further noted that Plaintiff needed to use a cane and walker, could not climb stairs without using a handrail, and needed to keep his right leg elevated.  (Id.)  He believed that Plaintiff could sit for five hours of an eight-hour workday but said he would "find it medically necessary for him not to do so." (Id.)  Plaintiff could stand and walk for no more than one hour in an eight-hour day, his pain would "constantly" interfere with his attention and concentration, and he could not tolerate even low-stress work.  (Id.)  Dr. Pinkerton concluded that Plaintiff was "severely disabled with his arthritis and fatigue due to hepatitis C."  (Id.)  He noted that Plaintiff's "conditions and limitations are reasonably consistent with her [sic] diagnosed impairments, have existed as long as I have him [sic] as my patient, have additionally been documented in my 'Lower Extremities Impairment Questionnaire' dated August 13, 2010, and

1  remain in effect throughout the present." (Id.)

2       On December 29, 2011, Dr. Pinkerton noted that Plaintiff had
3  knee and back pain and noted his "chronic problems" as hepatitis
4  C, hyperlipidemia, polycythemia, panic disorder, hypertension,
5  and right-knee arthritis. (AR 433.) He noted that Plaintiff's
6  hypertension was stable and he had a normal musculature, spine,
7  and back; no joint deformities or abnormalities; and normal range
8  of motion for all four extremities. (AR 434.)

9  **VI.   DISCUSSION**

10      Plaintiff alleges that the ALJ erred in (1) giving no weight
11 to Dr. Pinkerton's opinions and only reduced weight to Dr.
12 Dupee's opinion; (2) evaluating Plaintiff's credibility; and (3)
13 relying on the VE's testimony, which was inconsistent with the
14 Dictionary of Occupational Titles ("DOT"). (J. Stip. at 6.)
15 Because the ALJ's findings were supported by substantial evidence
16 and any errors were harmless, Plaintiff is not entitled to
17 remand.

18      A.   The ALJ's Evaluation of the Medical Evidence

19      Plaintiff claims that the ALJ erred in (1) rejecting Dr.
20 Pinkerton's opinions and (2) according only reduced weight to Dr.
21 Dupee's opinion. (J. Stip. at 7-15.)

22           1.   Applicable law

23      Three types of physicians may offer opinions in Social
24 Security cases: "(1) those who treat[ed] the claimant (treating
25 physicians); (2) those who examine[d] but d[id] not treat the
26 claimant (examining physicians); and (3) those who neither
27 examine[d] nor treat[ed] the claimant (non-examining
28 physicians)." Lester, 81 F.3d at 830. A treating physician's

opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.   Id.

The opinions of treating physicians are generally afforded more weight because they are employed to cure and have a greater opportunity to know and observe the claimant.   Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).   If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.   § 404.1527(c)(2).   If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.   § 404.1527(c)(2)-(6).

When a treating or examining doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.   Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31).   When a treating or examining physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting it.   Id. The weight given an examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things.

1  § 404.1527(c)(3).

2         2.  <u>Discussion</u>

3      Plaintiff contends that the ALJ erred in failing to properly

4  consider Drs. Pinkerton's and Dupee's opinions.

5             a.   *The ALJ did not err in considering Dr.*

6                  *Pinkerton's opinions*

7      The ALJ accorded "[l]ittle weight" to Dr. Pinkerton's

8  opinions regarding Plaintiff's physical limitations and

9  disability status, "significant weight" to examining physician

10 Klein's opinion, and "considerable weight" to nonexamining

11 physician Harris's opinion.[15]  (AR 21.)  As discussed below, the

12 ALJ provided specific and legitimate reasons for rejecting Dr.

13 Pinkerton's controverted opinions.

14     First, the ALJ rejected Dr. Pinkerton's opinions because

15 "the medical evidence including Dr. Pinkerton's treating records

16 contains very little objective evidence to support his findings."

17 (AR 20.)  Indeed, Dr. Pinkerton's disability opinions listed

18 alleged clinical findings including Plaintiff's right "femoral

19 atrophy" (AR 330, 430) and "progressive deformity" of his back,

20 ────────────

21     [15]   The ALJ summarized Dr. Pinkerton's April 2010 letter
   and August 2010 lower-extremities-impairment questionnaire.  (<u>See</u>
22 AR 20.)  After the ALJ issued his decision on May 9, 2011,
   Plaintiff submitted Dr. Pinkerton's June 6, 2011 opinion — which
23 was substantially similar to his previous two opinions — and
   additional treatment notes to the Appeals Council.  (AR 6, 430.)
24 The Appeals Council considered that evidence but found that it
   did not provide a basis for reversing the ALJ's decision.  (AR
25 2.)  As such, the Court considers it in determining whether the
   ALJ's decision was supported by substantial evidence.  <u>Brewes</u>,
26 682 F.3d at 1163; <u>see also</u> <u>Taylor</u>, 659 F.3d at 1232.  As
   discussed below, the ALJ's reasons for rejecting Dr. Pinkerton's
27 April and August 2010 opinions also apply to the June 2011
   opinion.
28

                              21

hands, and knees (AR 299), but those findings do not appear
anywhere in Dr. Pinkerton's treatment notes. To the contrary, in
December 2011, Dr. Pinkerton noted that Plaintiff had "[n]ormal
musculature, no joint deformities or abnormalities, [and] normal
range of motion for all four extremities." (AR 434.) Dr. Klein,
moreover, examined Plaintiff in January 2010 and found that he
had no atrophy, full motor strength, and normal range of motion
of the back, hands, and knees. (AR 260-61.) Dr. Pinkerton also
stated that radiological studies supported his findings (see AR
330), but as the ALJ correctly noted, his treatment record "d[id]
not contain any radiological studies, nor is a radiological
stud[y] ever[] referenced in his records" (AR 20). Finally, in
August 2010 and June 2011, Dr. Pinkerton noted that Plaintiff
needed to use a cane and walker (AR 331, 430), but his treatment
records do not mention such devices; moreover, in January 2010,
Dr. Klein noted that Plaintiff had a normal gait and did not use
a cane (AR 258, 262). Overall, Dr. Pinkerton's treatment notes
record very few clinical findings or test results; instead, they
occasionally state only that Plaintiff had knee arthritis and
received injections (AR 236, 316, 318-19, 321, 323-24, 326-27),
suffered from foot pain (AR 237) or anxiety (AR 302, 371), or had
a temporary health issue such as a burn on his hand (AR 319-20),
a reaction to his blood-pressure medication (AR 244, 314), an
infection (AR 239-40, 372), or bronchitis (AR 365). Such
generalized and conclusory findings fail to support Dr.
Pinkerton's opinions that Plaintiff was "severely" disabled for
the preceding five years (AR 299, 430), for half of which
Plaintiff was working full time (AR 50). As such, the ALJ was

1  entitled to reject them.  See Bayliss v. Barnhart, 427 F.3d 1211,

2  1216 (9th Cir. 2005) (holding that discrepancy between

3  physician's notes and his assessment of limitations was "clear

4  and convincing" reason for rejecting opinion); Connett v.

5  Barnhart, 340 F.3d 871, 874-75 (9th Cir. 2003) (affirming ALJ's

6  rejection of physician's RFC questionnaire because it was "not

7  supported by his own notes" and "had multiple inconsistencies

8  with all other evaluations" (alterations omitted)).

9       Plaintiff contends that his September 2007 MRI provided

10  objective support for Dr. Pinkerton's opinions because it

11  revealed "significant abnormalities," including tears,

12  osteoarthritis, effusion, and degeneration.  (J. Stip. at 11.)

13  That MRI, however, predated Plaintiff's November 2007 knee

14  surgery (AR 225-28), after which Dr. Kaplan released Plaintiff to

15  return to regular work duties (AR 221, 338).  As such, it fails

16  to support Dr. Pinkerton's 2010 and 2011 opinions that Plaintiff

17  had been "severely disabled" for the previous five years (AR 299,

18  430), particularly given that Plaintiff performed a heavy-

19  exertion job for about three of those five years of alleged

20  disability.  (See AR 50 (Plaintiff's testimony that he stopped

21  working in October 2008); AR 71-72 (VE testimony that Plaintiff

22  performed past work at "heavy exertional level").)  Plaintiff

23  also points to Dr. Pinkerton's "clinical findings" of "extension

24  limited to ten degrees" (J. Stip. at 12), but in making that

25  finding, Dr. Pinkerton failed even to indicate which joint was so

26  limited (AR 329).  Thus, as the ALJ found, Dr. Pinkerton's

27  opinions were unsupported by objective evidence or his own

28  treatment notes.

Second, the ALJ permissibly rejected Dr. Pinkerton's opinions because they appeared to have been based on Plaintiff's subjective complaints. (AR 20.) As the ALJ pointed out and as detailed above, Dr. Pinkerton's disability opinions were unsupported by any objective evidence and "suggest he relied heavily on information provided by [Plaintiff]." (Id.) As discussed more fully in Section VI.B, moreover, the ALJ's rejection of Plaintiff's subjective testimony was proper. Thus, to the extent Dr. Pinkerton relied on Plaintiff's discredited subjective complaints, the ALJ was entitled to disregard his opinions. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (when ALJ properly discounted claimant's credibility, he was "free to disregard" doctor's opinion that was premised on claimant's subjective complaints); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999) (when physician's opinion of disability premised "to a large extent" upon claimant's own accounts of symptoms, limitations may be disregarded if complaints have been "properly discounted").

Finally, the ALJ was entitled to rely on Drs. Klein's and Harris's opinions instead of Dr. Pinkerton's because they were supported by independent clinical findings and thus constituted substantial evidence upon which the ALJ could properly rely. See Tonapetyan, 242 F.3d at 1149; Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). In January 2010, Dr. Klein performed a full internal-medicine evaluation, noting, for example, that Plaintiff had a normal gait, good muscle tone and motion, full strength with no atrophy, intact sensation and reflexes, and normal ranges of motion. (AR 259-62.) Dr. Klein also ordered

24

and reviewed x-rays of Plaintiff's right knee, which revealed "[e]arly osteoarthritis." (AR 262-63.) Dr. Harris's opinion, moreover, relied on Dr. Klein's findings and was consistent with them.[16] See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."). The ALJ was also entitled to credit Drs. Klein's and Harris's opinions because they reviewed at least some of Plaintiff's medical records before rendering their opinions. (See AR 257 (Dr. Klein's notation that he reviewed two of Dr. Pinkerton's notes and notes from "[m]ultiple other visits" with "scanty history"); AR 287-88 (case analysis cited by Dr. Harris that summarized medical evidence)); see § 404.1527(c)(3) (in weighing medical opinions, ALJ "will evaluate the degree to which these opinions consider all of the pertinent evidence in [claimant's] claim, including opinions of treating and other examining sources"). Thus, any conflict in the properly supported medical-opinion evidence was "solely the province of the ALJ to resolve." Andrews, 53 F.3d at 1041.

Plaintiff contends that the ALJ should not have credited Dr. Klein's opinion because he did not review Plaintiff's MRI or knee-surgery report. (J. Stip. at 13.) But Dr. Klein noted Plaintiff's report that a 2008 right-knee MRI had shown a tear

---

[16]     In the space designated on the physical-RFC-assessment form for explaining "how and why the evidence supports [her] conclusions," Dr. Harris wrote "see case summary." (AR 283.) That summary discussed the medical evidence, including Dr. Klein's findings. (See AR 287-88.)

1  and that he subsequently underwent knee surgery.  (AR 258.)

2  Plaintiff, moreover, later provided Dr. Klein with a copy of the

3  MRI, which Dr. Klein attached to his report without altering his

4  opinion.  (AR 264-65.)  Moreover, Dr. Klein's findings were

5  largely consistent with those of Dr. Harris, who reviewed Dr.

6  Klein's report, which included an attached copy of the MRI.

7  (See AR 288.)  In any event, as noted above, Plaintiff's MRI

8  predated his knee surgery, after which Plaintiff improved and was

9  released to his regular work duties.  Thus, even if Dr. Klein had

10  not reviewed the MRI report before issuing his opinion, his

11  findings would still be credible.

12       Plaintiff is not entitled to remand on this claim.

13              b.   *The ALJ properly considered Dr. Dupee's*

14                   *opinion*

15       Regarding Plaintiff's mental limitations, the ALJ found that

16  he had the RFC to perform "simple, routine, repetitive tasks in a

17  job that [does] not require more than occasional interaction with

18  the public or co-workers" or "any exposure to hazardous

19  machinery, unprotected heights, or other high risk, hazardous or

20  unsafe conditions."  (AR 15.)  In doing so, the ALJ accorded

21  "considerable weight" to Dr. Dupee's opinion because "she had

22  [the] opportunity to examine [Plaintiff], her opinion is

23  consistent with the other evidence of record[,] and her opinion

24  is uncontradicted by any other medical source statement

25  indicating a greater degree of mental limitation."  (AR 22.)  He

26  also accorded "considerable weight" to reviewing physician

27  Tashjian's opinion because "he has knowledge of the disability

28  program; he had opportunity to review the medical records and

                              26

[Dr. Dupee's opinion]; his opinion is consistent with the other evidence of record; and his opinion is uncontradicted by any other medical source statement indicating a greater degree of mental limitation."   (<u>Id.</u>)

Plaintiff contends that despite crediting Dr. Dupee's opinion, the ALJ "provided no rationales whatsoever for simply excising [] critical aspects of Dr. Dupee's assessment" from Plaintiff's RFC, specifically, her finding of "additional moderate limitations in [Plaintiff's] ability to (1) relate and interact with supervisors, not only co-workers and the general public; (2) maintain concentration, attention, persistence, and pace; (3) associate with day-to-day work activity, including attendance and safety; (4) adapt to the stresses common to a normal work environment; (5) maintain regular attendance; and (6) perform work activities on a consistent basis."   (J. Stip. at 14-15.)

Contrary to Plaintiff's contention, the ALJ's RFC limitation to simple, repetitive, routine tasks sufficiently accommodated Dr. Dupee's finding that Plaintiff had moderate limitations in various areas, such as concentration, persistence, and pace. Indeed, Dr. Dupee opined that despite Plaintiff's moderate limitations, his ability to "understand, remember, and carry out simple one or two-step instructions" was unimpaired (AR 253), which was fully consistent with Dr. Tashjian's assessment that despite Plaintiff's moderate mental limitations, he was capable of "complet[ing] simple repetitive tasks" (AR 270).   Indeed, in <u>Stubbs-Danielson v. Astrue</u>, the Ninth Circuit found than an ALJ's limitation to "simple, routine, repetitive" work sufficiently

accommodated the examining and reviewing physicians' findings
that the claimant had a "slow pace" and "several moderate
limitations in other mental areas."   539 F.3d 1169, 1173-74 (9th
Cir. 2008).

Further, the ALJ's RFC limitation to nonhazardous work
appears to accommodate Plaintiff's moderate limitations in
attending to safety, and the limitation to routine and repetitive
tasks appears to accommodate his moderate limitations in adapting
to workplaces stresses.   (See AR 15.)   Plaintiff also contends
that the ALJ erred by failing to limit his interaction with
supervisors (J. Stip. at 14-15), but as discussed in Section
VI.C, the ALJ concluded at step five that Plaintiff could perform
the job of food-service worker, which required an insignificant
amount of interaction with people and did not require any talking
(see AR 24, 75); see also DOT 319.687-010, 1991 WL 672772
(describing food-service-worker job).   Because such limited
requirements presumably would accommodate any reduced ability to
interact with supervisors, any error was harmless.   See Molina v.
Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012) (ALJ's error harmless
when "inconsequential to the ultimate nondisability
determination" (citation and internal quotation marks omitted));
Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir.
2006) (same).

In any event, even if the ALJ did implicitly reject some of
Dr. Dupee's findings, he stated a valid reason for doing so in
noting that "there is [a] lack of objective evidence in the file

28

that would support [Dr. Dupee's] excessive findings." (AR 22);[17]
see Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195
(9th Cir. 2004) ("an ALJ may discredit treating physicians'
opinions that are conclusory, brief, and unsupported by the
record as a whole . . . or by objective medical findings");
§ 404.1527(c)(4) ("Generally, the more consistent an opinion is
with the record as a whole, the more weight we will give to that
opinion."); see also Valentine v. Comm'r, Soc. Sec. Admin., 574
F.3d 685, 692-93 (9th Cir. 2009) (contradiction between
physician's opinion and evidence in record, including his own
treatment notes, constituted specific and legitimate reason for
rejecting physician's opinion).[18]

---

[17]    For this reason and because the GAF scale does not
directly correlate with the Social Security Administration's
severity requirements, the ALJ was entitled to implicitly reject
Dr. Dupee's GAF score of 50.  See Doney v. Astrue, 485 F. App'x
163, 165 (9th Cir. 2012) (ALJ's failure to specifically address
GAF scores not error because "the Commissioner has determined the
GAF scale does not have a direct correlation to the severity
requirements in the Social Security Administration's mental
disorders listings" (alterations, citation, and internal
quotation marks omitted)).

[18]    Although Drs. Dupee's and Tashjian's findings largely
overlapped, the former found moderate limitations in Plaintiff's
ability to interact with supervisors, "associate with day-to-day
work activity," maintain regular attendance, and perform on a
consistent basis (AR 253) whereas Dr. Tashjian found that
Plaintiff was not significantly limited in those areas (AR 268-
69).  Because the ALJ also gave Dr. Tashjian's opinion
"considerable" weight and noted that Dr. Dupee's excessive
findings were unsupported by objective evidence, he stated a
permissible reason for discounting Dr. Dupee's opinion in the few
areas where the two differed.  Compare Betts v. Colvin, No.
11-17522, 2013 WL 3157434, at *1 (9th Cir. June 24, 2013)
(reversal warranted when ALJ gave "the greatest weight" to doctor
some of whose mental limitations ALJ implicitly rejected without
any explanation).

Indeed, Dr. Dupee's conclusions appear unsupported by her largely normal findings on examination: Plaintiff had a "depressed and anxious" mood and a flat affect but was nonetheless pleasant and cooperative, with regular speech, "linear, logical and goal directed" thought processes, and reasonable insight and judgment. (AR 250-51.) He could register three objects immediately and after five minutes, calculate change and serial threes, describe similarities and abstractions, spell "world" backward, and name various political figures and the capital of California. (AR 251-52.) Dr. Dupee concluded that Plaintiff's prognosis was "good." (AR 253.) Moreover, the only doctor to treat Plaintiff's assertedly debilitating psychiatric condition, Dr. Pinkerton, failed to even mention Plaintiff's mental illness in any of his three disability opinions (see AR 299, 329-36, 430) and in fact indicated in his August 2010 opinion that "emotional factors" did not contribute to the severity of Plaintiff's symptoms or functional limitations (AR 334). Dr. Dupee's findings are also undermined by Plaintiff's own statements that he had no problem getting along with family, friends, and neighbors; could pay attention as "long as needed"; got along well with authority figures; and was good at handling changes in routine, among other things. (See, e.g., AR 175-77.) Thus, even if the ALJ rejected some of Dr. Dupee's conclusions, he stated a valid reason for doing so.

Plaintiff is not entitled to remand on this ground.

B.   The ALJ Properly Assessed Plaintiff's Credibility

Plaintiff contends that the ALJ failed to provide clear and convincing reasons for discounting his credibility. (J. Stip. at

30

1   27-31.)  Because the ALJ did provide clear and convincing reasons

2   supporting his evaluation of Plaintiff's testimony and those

3   reasons were supported by substantial evidence in the record,

4   reversal is not warranted on this basis.

5              1.   Applicable law

6        An ALJ's assessment of pain severity and claimant

7   credibility is entitled to "great weight."  See Weetman v.

8   Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

9   F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

10  believe every allegation of disabling pain, or else disability

11  benefits would be available for the asking, a result plainly

12  contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina, 674 F.3d at 1112

13  (citation and internal quotation marks omitted).  In evaluating a

14  claimant's subjective symptom testimony, the ALJ engages in a

15  two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.

16  "First, the ALJ must determine whether the claimant has presented

17  objective medical evidence of an underlying impairment [that]

18  could reasonably be expected to produce the pain or other

19  symptoms alleged."  Id. at 1036 (citation and internal quotation

20  marks omitted).  If such objective medical evidence exists, the

21  ALJ may not reject a claimant's testimony "simply because there

22  is no showing that the impairment can reasonably produce the

23  degree of symptom alleged."  Smolen, 80 F.3d at 1282 (emphasis in

24  original).  When the ALJ finds a claimant's subjective complaints

25  not credible, the ALJ must make specific findings that support

26  the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th

27  Cir. 2010).  Absent affirmative evidence of malingering, those

28  findings must provide "clear and convincing" reasons for

                              31

rejecting the claimant's testimony.  Lester, 81 F.3d at 834.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  Thomas, 278 F.3d at 959.

            2.  Background

     In an undated disability report, Plaintiff wrote that his hepatitis C, osteoarthritis, hypertension, swollen legs, and tinnitus limited his ability to work.  (AR 164.)  In a December 5, 2009 function report, Plaintiff wrote that his daily activities included taking medication, lying down, having breakfast, washing up, going to the store "if necessary," reading the paper, watching television, visiting his neighbor, eating dinner, and running errands "when needed."  (AR 171.)  Plaintiff could perform "light cleaning," do his laundry, care for his hair, and shave.  (AR 172-73.)  He could bathe himself, but it was "hard to bend" and "wash all areas of the body," and he could use the toilet himself but it was "hard to sit or get up."  (AR 172.)  Plaintiff prepared sandwiches and frozen meals every day but could not prepare "complete meals" because that involved "too much standing."  (AR 173.)  Plaintiff went out every day and could drive, shop in stores for food and "sundries," pay bills, count change, handle a savings account, and use a checkbook and money orders.  (AR 174.)  He visited neighbors, talked to friends on the phone two or three times a week, and had no problem getting along with family, friends, and neighbors.  (AR 175-76.)

     Plaintiff wrote that his conditions affected his ability to lift, squat, bend, stand, walk, sit, kneel, hear, climb stairs, see, and use his hands.  (AR 176.)  He could walk 100 yards

before needing to rest for 10 to 15 minutes and could not lift 30 pounds. (Id.) Plaintiff could pay attention as "long as needed" and follow written and spoken instructions well. (Id.) He handled stress "not well" but got along well with authority figures and was good at handling changes in routine. (AR 177.) Plaintiff said he used a cane when walking or standing and had a "hard time" sleeping. (AR 177-78.)

In an undated "Disability Report – Appeal," Plaintiff wrote that his conditions had not changed since his last disability report. (AR 183.) He wrote that he could take care of his personal needs despite his conditions "but at a slower rate of time." (AR 186.)

On January 6, 2010, Dr. Dupee noted that Plaintiff lived alone and had difficulty showering but could drive, clean, and perform basic household duties. (AR 250.) On January 11, 2010, Dr. Klein noted that Plaintiff was able to dress, bathe, and toilet without assistance and did not use a cane. (AR 258.)

At the hearing on April 14, 2011, Plaintiff testified that his driver's license had been restricted after he was convicted of driving under the influence the previous October and he therefore drove only to court, a weekly meeting, and AA meetings. (AR 50-51.) Plaintiff said he was unable to work because his back and knees were "breaking down" and his legs would "swell up." (AR 56-57, 60.) Plaintiff testified that he had hepatitis C, but it had been "dormant" and "ha[d]n't really . . . flared up." (AR 61.) Plaintiff lived alone but his girlfriend came by to help him, brought him groceries, and did his laundry. (Id.) Plaintiff testified that he could walk to a store that was about

33

50 yards from his home, cook for himself, and clean his house. (<u>Id.</u>)

Plaintiff testified that he could walk about 200 yards but would "pay for it" afterward by having to elevate and ice his knee for about three hours. (AR 65-66.) He could lift up to 20 pounds and stand for "[u]nder an hour" or "a half hour" before having worsening knee pain and needing to sit down to rest. (AR 66.) Plaintiff testified that the Hyalgan injections that Dr. Pinkerton gave him "lessen[] [the pain] a whole lot" for about seven months. (AR 67-68.)

### 3. Discussion

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" Plaintiff's RFC for a limited range of medium work. (AR 16.) Reversal is not warranted based on the ALJ's alleged failure to make proper credibility findings or properly consider Plaintiff's subjective symptoms.

The ALJ permissibly discounted Plaintiff's subjective symptom testimony because "the objective medical evidence regarding [Plaintiff's] physical conditions [does] not support a finding that he is unable to perform any sustained work activity." (AR 18.) Plaintiff testified that he was unable to work because of his back and knee problems, but Dr. Klein found that Plaintiff's back had normal range of motion and equal muscle tone throughout with no tenderness or spasm, while his knees had

34

normal range of motion with only "mild pain" on the right, with no effusion, deformity, crepitus, or instability.  (AR 260-61.) Dr. Klein also found that Plaintiff had good muscle tone bilaterally, with "good active motion," "5/5" strength throughout, intact sensation, normal reflexes, no atrophy or fasciculation,[19] and a normal gait.  (AR 260-62.)  The ALJ was entitled to discount Plaintiff's subjective testimony to the extent it conflicted with the medical record.  See Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence"); Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Kennelly v. Astrue, 313 F. App'x 977, 979 (9th Cir. 2009) (same).

The ALJ also permissibly discounted Plaintiff's credibility based on "discrepancies" in his testimony.  (AR 19); see Molina, 674 F.3d at 1112 (in determining credibility, ALJ may consider inconsistencies in claimant's testimony); Burch, 400 F.3d at 680 (same).  Indeed, as the ALJ noted (AR 19), Plaintiff's testimony that his girlfriend brought him groceries and did his laundry was

---

[19]     Fasciculation is muscle twitching "caused by minor muscle contractions in the area, or uncontrollable twitching of a muscle group that is served by a single motor nerve fiber." Muscle twitching, MedlinePlus, http://www.nlm.nih.gov/medlineplus /ency/article/003296.htm (last updated Feb. 5, 2012).

inconsistent with his previous statements that he performed those activities himself (see AR 61, 171-74).  Moreover, Plaintiff's claim that he was unable to work because of hepatitis C, among other things (AR 164), was inconsistent with his statement that his hepatitis C was "dormant" and hadn't "flared up" (AR 61).

The ALJ also found that Plaintiff "ha[d] not generally received the type of medical treatment one would expect for a totally disabled individual," and what treatment he did receive had been "generally successful in controlling [his] symptoms." (AR 19.)  Indeed, although Plaintiff complained of debilitating musculoskeletal and psychiatric conditions, he received care only from his primary-care physician, Dr. Pinkerton, whom he saw about every two to four months after his onset date in October 2008. Dr. Pinkerton prescribed psychiatric medication, which Plaintiff said was helpful, and administered knee injections, which Plaintiff said significantly lessened his pain for several months at a time.  (AR 57, 59, 67-68.)  Plaintiff received no treatment for his hepatitis C and testified that the disease was "dormant" and "ha[d]n't really . . . flared up."  (AR 61.)  Dr. Pinkerton, moreover, never referred Plaintiff to a neurosurgeon, orthopedist, psychiatrist, or psychologist at any point after Plaintiff's alleged onset date.  (See AR 58.)  Thus, the ALJ was entitled to discount Plaintiff's credibility based on his positive response to conservative treatment.  See Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (ALJ may infer that claimant's "response to conservative treatment undermines [claimant's] reports regarding the disabling nature of his pain"); cf. Warre v. Comm'r Soc. Sec. Admin., 439 F.3d 1001, 1006

(9th Cir. 2006) ("[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for" social security benefits); <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989) (ALJ may rely on "unexplained, or inadequately explained, failure to seek treatment" in rejecting claimant's credibility); <u>McKnight v. Comm'r Soc. Sec.</u>, No. 1:12-cv-00726-AWI-JLT, 2013 WL 3773864, at *9 (E.D. Cal. July 17, 2013) (ALJ properly discounted physician's opinion based on claimant's positive response to conservative treatment, including knee injections and pain medication).

Plaintiff contends, however, that his treatment was not conservative because Dr. Pinkerton referred him to Dr. Kaplan, an orthopedist, who performed knee surgery. (J. Stip. at 29.) Dr. Kaplan treated Plaintiff in late 2007, however, almost a year before Plaintiff's alleged onset date, in October 2008. (<u>See</u> AR 217-28.) Moreover, in December 2007, just one month after Plaintiff's knee surgery, Dr. Kaplan noted that Plaintiff was doing well and released him to return to his regular work duties. (AR 221, 338.) Indeed, Plaintiff worked full time for another 10 months. (AR 50.) Further, Dr. Kaplan apparently has not treated Plaintiff since then. (<u>See</u> AR 57-58.) Thus, Plaintiff's knee surgery and referral to Dr. Kaplan, both of which predated Plaintiff's onset date, do not undermine the ALJ's finding that Plaintiff's conditions improved with conservative treatment.

The ALJ was also entitled to discount Plaintiff's credibility because his claims of disability conflicted with his reported daily activities. (<u>See</u> AR 18); <u>Smolen</u>, 80 F.3d at 1284 (ALJ may use "ordinary techniques of credibility evaluation,"

such as "prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid"); <u>Thomas</u>, 278 F.3d at 958-59 (in assessing credibility, ALJ may consider inconsistencies either in claimant's testimony or between testimony and conduct); <u>cf.</u> <u>Molina</u>, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."). Indeed, Plaintiff asserted that his knee and back pain were totally debilitating, but he was nonetheless able to, for example, make his own meals, clean his apartment, shop for groceries and other items, do laundry, run errands, drive, and attend AA meetings. (AR 51, 61, 171-74.) Plaintiff's claims of suffering from debilitating anxiety and depression were also inconsistent with his asserted ability to pay attention "as long as needed"; follow written and spoken directions; visit neighbors and talk to friends on the phone two or three times a week; handle changes in routine; get along with friends, family, neighbors, and authority figures; pay bills; count change; handle a savings account; and use a checkbook. (AR 171, 174, 175-77.) Indeed, the Ninth Circuit has found that daily activities similar to Plaintiff's – such as shopping, cleaning, doing laundry, and managing finances — suggest that the claimant is quite functional and able to work. <u>See</u> <u>Stubbs-Danielson</u>, 539 F.3d at 1175 (upholding ALJ's determination that claimant's "normal activities of daily living, including cooking, house cleaning, doing laundry, and helping her husband in managing finances" suggested that she "may still be capable of

performing the basic demands of competitive, remunerative, unskilled work on a sustained basis"); <u>Burch</u>, 400 F.3d at 680 (ALJ rationally found that claimant's daily activities, including caring for personal needs, cooking, cleaning, shopping, and "manag[ing] her own finances and those of her nephew" suggested she was "quite functional"). Plaintiff's daily activities were therefore a clear and convincing reason for discounting his credibility.

Some of the ALJ's credibility findings, however, may not have been clear and convincing. The ALJ noted that Plaintiff took Vicodin for only two months at a time and concluded that "[t]he fact that the claimant is not prescribed narcotic medication for the pain on a regular basis[] suggests that his symptoms are not particularly serious." (AR 19.) Plaintiff testified, however, that he staggered his use of Vicodin "so it doesn't become a habit" and because "after a while you build up a tolerance to it." (AR 64); <u>see</u> <u>Carmickle</u>, 533 F.3d at 1162 (finding that claimant's "minimal treatment regime is not a proper basis for finding him non-credible" when claimant testified that he did not take stronger pain medication because he feared "addiction potential or intolerable side effects"). The ALJ also noted that Plaintiff did not take medication for his hepatitis C, but Plaintiff indicated that he had not started treatment for that condition in part because he did not have health insurance.[20]  (AR 59-60); <u>see</u> <u>Smolen</u>, 80 F.3d at 1284

---

[20]    It is unclear, however, why Plaintiff did not seek treatment for his hepatitis C before October 2008, when he was employed and therefore presumably insured. (<u>See</u> AR 50

1  (finding that claimant's failure to seek treatment not proper

2  basis for discrediting testimony when Plaintiff testified that

3  she did not seek treatment because she "had no insurance and

4  could not afford treatment"). Because Plaintiff may have

5  provided good reasons for not consistently taking Vicodin or

6  undergoing hepatitis C treatment, the ALJ should not have relied

7  on those factors to discount Plaintiff's credibility. See id.

8  ("Where a claimant provides evidence of a good reason for not

9  taking medication for her symptoms, her symptom testimony cannot

10 be rejected for not doing so."). Despite that potential error,

11 however, reversal is not warranted because the remainder of the

12 ALJ's credibility findings were valid and supported by

13 substantial evidence in the record. See Carmickle, 533 F.3d at

14 1162 (ALJ's reliance on erroneous reasons for adverse credibility

15 determination harmless when substantial evidence supported

16 determination and errors did not negate its validity); Batson,

17 359 F.3d at 1197 (same). This Court may not "second-guess" the

18 ALJ's credibility finding simply because the evidence may have

19 been susceptible of other interpretations more favorable to

20 Plaintiff. See Tommasetti, 533 F.3d at 1039.

21     Plaintiff is not entitled to remand on this ground.

22     C.   The ALJ Permissibly Relied on the VE's Testimony

23     Plaintiff contends that in finding Plaintiff able to perform

24 alternative work, the ALJ erroneously relied on the VE's

25 testimony because it was inconsistent with the DOT and the VE

26 failed to explain those discrepancies. (J. Stip. at 39-40.) For

27 ─────────────────────────

28 (Plaintiff's testimony that he stopped working in October 2008);
AR 388 (May 2007 treatment note listing hepatitis C diagnosis).)

the reasons stated below, however, reversal is not warranted on this ground.

### 1.   Applicable law

At step five of the sequential evaluation process, the Commissioner has the burden to demonstrate that the claimant can perform work that exists in "significant numbers" in the national or regional economy, taking into account the claimant's RFC, age, education, and work experience.  Tackett v. Apfel, 180 F.3d 1094, 1100 (9th Cir. 1999); 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c).  The Commissioner may satisfy that burden either through VE testimony or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2.  Tackett, 180 F.3d at 1100-01.  When a VE provides evidence about the requirements of a job, the ALJ has a responsibility to ask about "any possible conflict" between that evidence and the DOT.[21]  See SSR 00-4p, 2000 WL 1898704, at *4; Massachi v. Astrue, 486 F.3d 1149, 1152-54 (9th Cir. 2007) (holding that application of SSR 00-4p is mandatory).  When a conflict exists, an ALJ must determine whether there exists a basis for relying on the VE's testimony rather than the DOT.  See Massachi, 486 F.3d at 1153; SSR 00-4p, 2000 WL 1898704, at *4.

---

[21]   In making disability determinations, the Commissioner takes "administrative notice of reliable job information" from the DOT, § 404.1566(d), which is usually "the best source for how a job is generally performed," Pinto v. Massanari, 249 F.3d 840, 845-46 (9th Cir. 2001); see also Massachi v. Astrue, 486 F.3d 1149, 1153 (9th Cir. 2007) ("In making disability determinations, the Social Security Administration relies primarily on the [DOT] for information about the requirements of work in the national economy." (citation and internal quotation marks omitted)).

2.  <u>Background</u>

At the hearing, the VE testified that a person with Plaintiff's limitations could perform the jobs of "hand packager," DOT 920.587-018, 1991 WL 687916; "[k]itchen helper," DOT 318.687-010, 1991 WL 672755; and "food service worker in a hospital setting," DOT 319.687-010, 1991 WL 672772.  (AR 75.) The VE confirmed that his testimony was largely consistent with the DOT.[22]  (AR 79-80.)

In his written decision, the ALJ stated that the VE testified that an individual with Plaintiff's RFC could perform the jobs of "[h]and [p]ackager (DOT No. 920.587-018)," "[k]itchen [h]elper (DOT No. 318.687-010)," and "[f]ood [s]ervice [w]orker (DOT No. 319.677-014)."[23]  (AR 24.)  The ALJ noted that the VE's

_____

[22]   The VE indicated that his testimony in response to the portion of the ALJ's hypothetical regarding the need for hourly breaks from standing was not consistent with the DOT, but "other than that, [it was] according to the DOT code."  (AR 79-80.) Plaintiff does not contend that any portion of the VE's testimony was inconsistent with his RFC requirement for hourly breaks. (<u>See</u> J. Stip. at 39-40.)

[23]   The ALJ stated that the VE testified that the food-service-worker job carried the DOT code of 319.677-014 (AR 24) but the VE actually testified that the job carried the DOT code of 319.687-010 (AR 75).  The Commissioner acknowledges this mistake but asserts that it was a harmless "typographical error." (J. Stip. at 42.)  Indeed, the ALJ appears to have simply misstated the DOT code, as he listed the job title that the VE provided — food-service worker — and expressly stated that he was relying on the VE's testimony that Plaintiff could perform the three identified jobs.  (<u>See</u> AR 24.)  Because the ALJ based his findings on the VE's testimony, not the incorrect DOT code listed in his decision, any typographical error was harmless.  <u>See, e.g.</u>, <u>Wright v. Comm'r of Soc. Sec.</u>, 386 F. App'x 105, 109 (3d Cir. 2010) (Tashima, J., sitting by designation) (ALJ's misstatements in written decision harmless error when regardless of them "ALJ gave an adequate explanation supported by

42

testimony was "consistent with the information contained in the [DOT]" and concluded, "[b]ased on the testimony of the [VE]," that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Id.) The ALJ therefore found that Plaintiff was not disabled.

### 3. Discussion

Petitioner argues that the ALJ erred in relying on the VE's testimony because it conflicted with the DOT and the VE failed to acknowledge or explain that conflict. (J. Stip. at 39-40.) Plaintiff notes that according to the DOT, the hand-packager job requires "occasional balancing," the kitchen-helper job requires "frequent crouching," and the food-service-worker job requires "more than occasional" interaction with coworkers and the public. (J. Stip. at 40.) Plaintiff contends that those requirements exceed the limitations outlined in his RFC.

The Commissioner agrees that "there may be a conflict between Plaintiff's RFC and the DOT descriptions for Hand Packager (DOT No. 920.587-018) and Kitchen Helper (DOT No. 318.687-010)." (J. Stip. at 41.) Indeed, Plaintiff is precluded from performing work that requires "climbing ladders, ropes or scaffolds, or balancing" (AR 15), but according to the DOT, the

---

substantial evidence in the record"); Bartlett v. Colvin, No. EDCV 12-1014-DTB, 2013 WL 3722071, at *5 (C.D. Cal. July 15, 2013) (ALJ's erroneous recitation of medical expert's testimony harmless when ALJ "did not appear to base his RFC determination on this incorrect representation of [medical expert's] testimony"). Plaintiff, moreover, identified the correct DOT code in his argument and does not contest the Commissioner's assertion that the ALJ's error was harmless. (See AR 39-40.)

1   hand-packager job requires balancing "[o]ccasionally," which it
2   defines as "up to 1/3 of the time," DOT 920.587-018, 1991 WL
3   687916.  Plaintiff is also limited to only "occasional[]"
4   crouching (AR 15), but the kitchen-helper job requires crouching
5   "[f]requently," which it defines as "from 1/3 to 2/3 of the
6   time," DOT 318.687-010, 1991 WL 672755.  As Plaintiff contends
7   and the Commissioner does not dispute, the VE failed to explain
8   those apparent conflicts between the DOT and his testimony, and
9   the ALJ therefore erred by relying on those jobs as ones
10  Plaintiff could perform given his RFC.  (J. Stip. at 39-41); see
11  Massachi, 486 F.3d at 1153; SSR 00-4p, 2000 WL 1898704, at *4.

12      The Commissioner correctly contends, however, that no
13  conflict existed between the VE's testimony that Plaintiff could
14  perform a third job, which the VE referred to as "food service
15  worker in a hospital setting" and the DOT described as "counter-
16  supply worker." (J. Stip. at 41; see also AR 75); DOT 319.687-
17  010, 1991 WL 672772.  Although Plaintiff contends that the food-
18  service-worker job was incompatible with his RFC for only
19  occasional interaction with coworkers and the public (J. Stip. at
20  39-40), the DOT description actually indicates that the job
21  primarily involves moving trays of food and other items from a
22  kitchen to a cafeteria serving area, not serving food to patrons
23  or otherwise dealing directly with people:

24          Replenishes food and equipment at steamtables and serving
25          counters of cafeteria to facilitate service to patrons:
26          Carries food, dishes, trays, and silverware from kitchen
27          and supply departments to serving counters.  Garnishes
28          foods  and  positions  them  on  table  to  ensure  their

1 | visibility to patrons and convenience in serving.  Keeps
2 | assigned area and equipment free of spilled foods.  Keeps
3 | shelves of vending machines stocked with food when
4 | working in automat.

5 DOT 319.687-010, 1991 WL 672772.  The DOT also states that

6 dealing with people is a "[n]ot [s]ignificant" part of the food-

7 service-worker job and "talking" is "[n]ot [p]resent" and "does

8 not exist" in that job.  (Id.)  Indeed, Plaintiff acknowledges

9 that the job is "unskilled" (J. Stip. at 40), and such work

10 ordinarily involves dealing primarily with objects rather than

11 data or people, see SSR 85-15, 1985 WL 56857, at *4.

12 Plaintiff contends, however, that the job exceeds his RFC

13 for only occasional interaction with coworkers and the public

14 because such workers "would . . . not be working alone, having

15 co-workers with them in the food preparation duties."  (J. Stip.

16 at 40.)  But Plaintiff's RFC does not mandate that he work

17 "alone"; it merely limits him to only "occasional" interaction

18 with coworkers and the public.  (See AR 15.)  Nothing in the DOT

19 description indicates that the food-service-worker job requires

20 more than that.

21 As such, the error in the ALJ's finding that Plaintiff could

22 perform the hand-packager and kitchen-helper positions was

23 harmless because the finding that Plaintiff could perform the

24 food-service-worker job was supported by substantial evidence and

25 free of legal error.  See Molina, 674 F.3d at 1115 (ALJ's error

26 harmless when "inconsequential to the ultimate nondisability

27 determination" (citation and internal quotation marks omitted));

28 see also Yelovich v. Colvin, No. 11-36071, 2013 WL 3216042, at *1

1  (9th Cir. June 27, 2013) (ALJ's reliance on VE's incorrect
2  testimony that claimant could perform two occupations harmless
3  when ALJ also relied on VE's accurate testimony that claimant
4  could perform third job). The VE testified, moreover, that 3800
5  such jobs existed regionally and 190,000 nationally (AR 75), a
6  "significant number" sufficient to uphold the ALJ's decision, <u>see</u>
7  <u>Thomas</u>, 278 F.3d at 960 (1300 jobs in state sufficient); <u>Meanel</u>
8  <u>v. Apfel</u>, 172 F.3d 1111, 1115 (9th Cir. 1999) (between 1000 and
9  1500 jobs in local area sufficient); <u>Moncada v. Chater</u>, 60 F.3d
10 521, 524 (9th Cir. 1995) (2300 jobs in county and 64,000
11 nationwide sufficient).

12      Plaintiff is not entitled to remand on this ground.

13 **VII. CONCLUSION**

14      Consistent with the foregoing, and pursuant to sentence four
15 of 42 U.S.C. § 405(g),[24] IT IS ORDERED that judgment be entered
16 AFFIRMING the decision of the Commissioner and dismissing this
17 action with prejudice.  IT IS FURTHER ORDERED that the Clerk
18 serve copies of this Order and the Judgment on counsel for both
19 parties.

20
21
22 DATED:    October 28, 2013      JEAN ROSENBLUTH
23                                JEAN ROSENBLUTH
                                  U.S. Magistrate Judge
24
25
_____

26      [24]    This sentence provides: "The [district] court shall
27 have power to enter, upon the pleadings and transcript of the
   record, a judgment affirming, modifying, or reversing the
28 decision of the Commissioner of Social Security, with or without
   remanding the cause for a rehearing."